UNITED STATES, Appellee

v

RICHARD L. KANTNER, Specialist Four,
U. S. Army, Appellant

11 USCMA 201, 29 CMR 17

No. 13,359

Decided January 29, 1960

First Lieutenant Robert D. Stiles argued the cause for Appellant, Accused. With him on the brief were Lieutenant Colonel W. H. Blackmarr, First Lieutenant Herbert R. Brown, and First Lieutenant William L. Garwood.

First Lieutenant Barry L. Kroll argued the cause for Appellee, United States. With him on the brief was Lieutenant Colonel James G. McConaughy.

Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted of the larceny of two money orders belonging to his roommate, and sentenced to a dishonorable discharge and confinement at hard labor for one year. The question before us is whether a pretrial statement made by him was properly admitted in evidence.

Sergeant First Class W. L. Koski, the accused's roommate, testified that on July 31, 1958, he purchased two postal money orders—one for $53.50 and the other for $14.00—which he intended to mail for payments due on two loans. He placed the money orders in the top compartment of his wall locker. On August 5, he discovered they were missing. That same day, the accused purportedly saw the money orders on the floor of the corridor at the water fountain outside the room, just as Specialist Edmonds, a friend of his, was

**201**

"coming up the hall." The accused picked up the money orders and said, "Gee, look what I found." He put the instruments into his pocket. His later actions are explained in the following excerpts from his testimony:

"Q. When you first picked up these money orders what did you plan to do?

"A. I planned to find out who the owner was as soon as I came back from Baltimore.

"Q. Did you ask anybody who the owner was?

"A. Yes, sir. As I was going down the steps there was 3 or 4 fellows and I asked if they heard of anybody that lost them. They said no.

"Q. What did you tell Specialist Poole?

"A. As we were going into Baltimore I stated somebody lost the money orders and as I was going in and I owed this car company a car payment I figured whoever lost them —I could keep them. They was just as good as money. When we got to Baltimore I went to the car lot first and talked to him and he said he wanted his money. I took my car to the garage first and we walked back to the bank. That's where I cashed one money order for $53.50.

"Q. Did you sign your name to it?

"A. Yes, sir, I signed my name to it.

"Q. What did you say you figured on the way to Baltimore?

"A. As I was going in, this fellow had said he needed his money for the car payment and I hadn't the money and I figured I had money orders and losers weepers, finders keepers.

. . . . .

"Q. And when you walked downstairs you asked 3 or 4 people if they lost the money orders, is that correct?

"A. Yes, sir.

"Q. Do you know who these 3 or 4 people were?

"A. No, sir, they were just standing there reading the bulletin board. Someone in the crowd said no so I left.

"Q. Did you go to the orderly room to inquire?

"A. No, sir.

"Q. Who is ordinarily billeted in the area where you found the money orders?

"A. There was Sergeant Sanders and Sergeant Moore sleeping next to me.

"Q. Generally, is that the area where NCOs are billeted?

"A. Yes, sir, that's right.

"Q. Individual rooms, two to a room?

"A. Yes, sir.

"Q. Did you inquire of any of these NCOs in that area if they had lost or missed the money orders?

"A. No, sir, they were not there at the time. They were having formation.

"Q. Did you attempt to find them at all?

"A. No, sir.

"Q. When did you form this finders keepers attitude?

"A. I figured as I was going to Baltimore, I needed the money and I figured, what the heck, it was just as good as gold.

"Q. You had no money at the time?

"A. I had a couple of dollars, sir."

The accused's trial testimony is substantially the same as a pretrial statement made by him, which was admitted in evidence over defense objection. The defense contends the testimony is different in a material respect from the statement. At trial, the accused said he kept the money orders because he "figured . . . losers weepers, finders keepers." In the pretrial statement the accused admitted that he realized he was "doing wrong" when he cashed the money orders as his own, but he "needed the money" so he "took a chance." In his testimony, the accused denied the truth of that statement. He said his answer was changed by one of the agents who interrogated him because he claimed that "the Army wouldn't go along" with his "Finders keepers, losers weepers" statement.

It is arguable that the accused's testimony also shows clearly he knew it was wrong to cash the money orders; and it does not, as contended by appel-

late defense counsel, amount to a defense of an honest belief by the accused that he had the right to keep the money orders because they were lost property. The accused admitted each of the money orders had a serial number on it; that on its face, it showed it was issued by the Ft. George G. Meade post office; that he knew this was the only such office on the post. He also admitted his first thought was to find the owner, and he even made some inquiries for that purpose. Then he "figured, what the heck," he had the money orders which were "just as good as gold," so he might as well pay his debts and let the loser weep. There is no indication whatever in this account of his actions and thoughts to show the accused ever entertained an honest belief that, as the finder, he had a legal right to keep the property. See United States v Sims, 5 USCMA 115, 17 CMR 115; 52 CJS, Larceny, § 26. In other words, the accused's testimony tends to show he knew his retention of the money orders was wrong. However, we need not make a closer examination of the accused's testimony. Instead, we reach the issue specifically presented by the accused's petition for review. As to that, we are satisfied there is no evidence to support the defense contention that the pretrial statement is inadmissible because the accused was deprived of his right to consult counsel.

Chief Warrant Officer G. L. Bedford testified he was a Criminal Investigations Detachment agent. On December 3, 1958, he interrogated the accused about 9:00 a. m. in the presence of R. E. O'Donnell, a Post Office Department inspector. He informed the accused he was suspected of cashing money orders which did not belong to him, and advised him he did not have to make "any statement whatsoever," but if he did, it could be used against him in a court-martial proceeding. He then had a discussion with the accused. After the discussion, he prepared a typewritten statement which the accused read and signed. No threats, force, duress, or promises were used to get the accused either to make or to sign the statement. The interrogation lasted from about 9:00 a. m. to 12 Noon. On cross-examination, Bedford was questioned as to whether the accused had asked for a lawyer. All of his testimony on that point is as follows:

"Q [DC]. Did Kantner ever say, 'I don't want to say anything until I talk to my attorney.'?
"A. He may have said something like that.
"Q. At the time did Mr. O'Donnell say, 'We will just hand this over to the federal authorities'?
"A. No.

.    .    .    .    .

"Q [TC]. Now, Mr, Bedford, you stated that Kantner said something about he wouldn't make a statement until he saw his attorney. Can you maybe clarify that a little for us, spell it out a little more for us?
"A. When I was talking with Kantner he was upset and he said, 'I am not sure I should say anything until I can see an attorney. I would like to get an attorney.'
"Q. At what point of the interview did he say this to you?
"A. This was well after we discussed it for a few minutes and I had advised him of his rights.
"Q. At any time did he ask to talk to an attorney?
"A. No."

Postal Inspector O'Donnell directly corroborated Bedford, except that he could not recall any statement by the accused about a lawyer. At the end of this testimony, the prosecution offered the accused's pretrial statement into evidence. Defense counsel objected, on the ground that the accused "asked for the service of a lawyer at the interrogation and he was not given the right to counsel." Defense counsel was asked if he wanted to present additional evidence on the issue, but refused the opportunity. Trial counsel then argued that the accused had made an insufficient showing to support the claim of denial of counsel. The law officer thereupon overruled the objection and admitted the evidence. Later in his testimony on the merits the accused said: "I was making the statement [about finders keepers, losers weepers] when he told me I was charged with

larceny. I told him I wanted to talk to a lawyer and that's when he said, his exact words were, 'This boy has been over the coals before. He knows what it is all about.' "

Ordinarily, the correctness of a ruling by the law officer is determined on the basis of the evidence ▆▆▆ before him at the time of the ruling. United States v Richard, 7 USCMA 46, 51, 21 CMR 172. Defense counsel, however, refer to the accused's testimony as support for their argument, and for present purposes we may consider it part of the evidence relating to the issue. Except for the remark about the accused being "over the coals before," the accused's testimony coincides with Bedford's. Both indicate that after some discussion about the alleged offense, the accused said he wanted to talk to a lawyer. What happened then?

We may infer that the accused did not in fact talk to a lawyer. But the question is why? There is absolutely no evidence that Bedford or anyone else told the accused he could not consult with a lawyer. Thus, the situation is distinguishable from that in United States v Gunnels, 8 USCMA 130, 23 CMR 354, relied upon by the accused. There, the evidence showed clearly that the accused was informed he was not entitled to consult with a lawyer. See also United States v Rose, 8 USCMA 441, 24 CMR 251; United States v Wheaton, 9 USCMA 257, 26 CMR 37. For all we know from the record of trial, the accused may simply have changed his mind when he heard the "over the coals" response to his statement about a lawyer; and he may have determined that his already-asserted claim of innocence would carry more weight if, by his action, he in effect said "well I really have nothing to hide, so I don't need to talk to a lawyer before I talk to you."

An accused has a right to consult with counsel, and law enforcement agents cannot deprive him ▆▆▆ of that right. If the accused contends he was deprived of or misinformed of his right to consult with counsel, there must be evidence to support the contention. Here, there is a fatal gap. The statement of a desire to talk to counsel is present, but there is no proof of a denial of the opportunity. The probability that the accused changed his mind is too logical and too strong under the circumstances of the case to be outweighed by the tenuous inference that he was deprived of counsel because three hours before he signed the written statement he said he wanted to talk to a lawyer. See United States v Cadman, 10 USCMA 222, 27 CMR 296. There is, therefore, insufficient evidence to show a denial of the right to consult counsel, and the law officer's ruling is correct.

The insufficiency of the evidence to support the claim of a denial of counsel distinguishes this case from United States v Alaniz, 9 USCMA 533, 26 CMR 313. In *Alaniz* the staff judge advocate was of the opinion that the law officer had erred in admitting evidence of the results of a search. The evidence pertaining to the legality of the search was in conflict. Accordingly, we held that the convening authority's action, predicated upon the review, presented a "factual determination" which was binding upon us. Here, the staff judge advocate made the following statement:

"Viewing the testimony as a whole, it appears that the accused had probably requested to be allowed to talk to an attorney but that he was not given the opportunity to talk to an attorney. For this reason, the pretrial statement of the accused was inadmissible. The law officer erred in admitting into evidence the written pretrial statement of the accused."

The record, however, contains no evidence to support the quoted conclusion and we are not bound by it. See United States v Bishop, 11 USCMA 117, 28 CMR 341.

The decision of the board of review is affirmed.

Judge LATIMER concurs.

FERGUSON, Judge (dissenting):

I dissent.

204

With the decision of the majority in this case, United States v Alaniz, 9 USCMA 533, 26 CMR 313, is reversed despite a purported distinction, and the principles originally enunciated in United States v Gunnels, 8 USCMA 130, 23 CMR 354; United States v Rose, 8 USCMA 441, 24 CMR 251; and United States v Wheaton, 9 USCMA 257, 26 CMR 37, become so limited there is little chance that an accused person will derive any benefit from his right to counsel.

The accused was found guilty of larceny, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for one year. Intermediate appellate authorities affirmed, and we granted review on the issue whether accused's pretrial statement was erroneously admitted in evidence.

Accused's roommate, one Sergeant Koski, purchased two money orders on July 31, 1958. The money orders contained no entries indicating the identity of the purchaser or the payee. He placed the orders in his wall locker. On August 5, 1958, he discovered the money orders were missing. On the same day, the accused, accompanied by one Poole, cashed one of the money orders in a Baltimore bank in order to pay a debt. A few days later, he cashed the other order. In a pretrial statement made to criminal investigators, accused related that he had found the money orders on the floor in the barracks hallway. He asked several individuals if they had lost the items and, upon receiving a negative response, decided to use them to pay his obligations. He stated that he knew he was "doing wrong" but was desperately short of funds.

The accused produced witnesses to support his claim of finding the money orders and his general inquiry of several soldiers concerning whether they had lost them. He also testified in his own behalf. He generally reiterated the circumstances set forth in his pretrial statement but claimed that he honestly believed he had a right to con-

vert the money orders to his own use. He denied having stated in his confession he knew he was "doing wrong" and asserted that this declaration resulted from being informed by the investigators that "the Army wouldn't go along with that statement, 'Finders keepers, losers weepers.'"

The pretrial statement was obtained from the accused by Agent Bedford in the presence of a postal inspector. Bedford stated that he had appropriately advised the accused of his rights under Code, supra, Article 31, 10 USC § 931, and had obtained the statement from him. However, the following testimony was elicited concerning accused's desire to consult counsel:

"Q. Did Kantner ever say, 'I don't want to say anything until I talk to my attorney.'?

"A. He may have said something like that.

. . . . .

"Q. Now, Mr. Bedford, you stated that Kantner said something about he wouldn't make a statement until he saw his attorney. Can you maybe clarify that a little for us, spell it out a little more for us?

"A. When I was talking with Kantner he was upset and he said, 'I am not sure I should say anything until I can see an attorney. I would like to get an attorney.'

"Q. At what point of the interview did he say this to you?

"A. This was well after we discussed it for a few minutes and I had advised him of his rights.

"Q. At any time did he ask to talk to an attorney?

"A. No.

"Q. Did he ask you to procure an attorney for him, some JAG officer or anyone else?

"A. No."

The postal inspector could not recall "any mention of an attorney being made in this particular case."

Counsel for the accused objected to the receipt of the confession on the ground that the accused was deprived of his right to consult an attorney. The objection was overruled and the

statement admitted in evidence. Subsequently, the accused, testifying on the merits of the case, declared he had informed Bedford that he desired to consult an attorney. Bedford's exact reply was, " 'This boy has been over the coals before. He knows what it is all about.' "

In discussing the admissibility of the statement, the staff judge advocate made the following comments in his review:

"Viewing the testimony as a whole, it appears that the accused had probably requested to be allowed to talk to an attorney but that he was not given the opportunity to talk to an attorney. For this reason, the pretrial statement of the accused was inadmissible. The law officer erred in admitting into evidence the written pretrial statement of the accused.

"However, while the admission of the pretrial statement was error, the accused testified in his own behalf and admitted all the material matters contained in his pretrial statement. . . .

"Therefore, the error of the law officer in admitting the accused's pretrial statement (Pros Ex 9) was not prejudicial in that the accused's testimony on the merits of the case in substance was a waiver."

The convening authority took action in accordance with the recommendations of the staff judge advocate, thus adopting the findings contained in the review.[1]

In United States v Alaniz, supra, we were confronted with a similar situation. There, the staff judge advocate found, as a matter of fact, that the law officer had erred in concluding that the accused had consented to an otherwise illegal search. In stating that the finding of the staff judge advocate was binding upon us, we said:

"In United States v Massey, 5 USCMA 514, 18 CMR 138, we stressed the convening authority's almost absolute appellate reviewing powers. It is clear beyond cavil that this Court is not possessed of fact-finding powers. Article 67(d), Uniform Code of Military Justice, 10 USC § 867, and that we may not overturn a truly factual determination based upon the evidence of record made by intermediate appellate bodies possessed of fact-finding jurisdiction. United States v Bunting, 6 USCMA 170, 19 CMR 296; United States v Moreno, 5 USCMA 500, 18 CMR 124; United States v Moreno, 6 USCMA 388, 20 CMR 104. *In the present case the factual determination of this controverted factual issue by the convening authority is binding upon this Court.*" [Emphasis]

I see no difference between the factual issue of consent to a search of one's dwelling and the factual issue of the denial to an accused of his right to consult counsel. Assuming *arguendo* that there was room for disagreement on the question, a proposition which I personally reject, the matter has now become final, and we step outside our sphere when we substitute our judgment for that of the convening authority. United States v Alaniz, supra. And see United States v Wheatley, 10 USCMA 537, 28 CMR 103, for a similar holding with respect to factual determinations by a board of review. In short, there being a rational basis in the record upon which the review could reach the conclusion set forth therein, it ill behooves us to upset the findings of the

---

[1] The Manual for Courts-Martial, United States, 1951, provides pertinently, in paragraph 85c, at page 141:
". . . In those unusual cases in which a convening authority is in disagreement with his staff judge advocate or legal officer as to the effect of any error or irregularity respecting the proceedings, as to the adequacy of the evidence, or as to what sentence can legally be approved, the convening authority may transmit the record of trial, *with an expression of his own views* and the opinion of his staff judge advocate or legal officer, to the Judge Advocate General of the armed force concerned for advice." [Emphasis supplied.] That procedure was not followed in this case. Hence, it must be assumed that the convening authority adopted the staff judge advocate's findings of fact.

convening authority simply because others may have reached a different conclusion.

As I read the record, however, there is a clear showing the accused was, as a matter of law, deprived of his right to consult counsel. He indicated to the criminal investigator that he "would like to get an attorney." True, he did not seek Bedford's assistance in employing a civilian attorney or consulting an officer of the Staff Judge Advocate Section. Nevertheless, as Bedford's testimony clearly indicates, he was unmistakably informed that the accused did not desire to make a statement until he had consulted a legal advisor.

My brothers seem to think a military suspect must bound from the interrogation room to the nearest telephone or run the risk of having subsequent admissions placed in evidence against him. This places too much emphasis on resistance to superior military authority and too little on the naturally submissive attitude of a soldier in the hands of the military police. Moreover, it ignores the fact that rights which exist only *in vacuo* do not, for practical purposes, exist at all. Thus, when an accused unequivocally indicates a desire to communicate with his attorney, and the criminal investigator continues to interrogate him with the observation

that the suspect "has been over the coals before," it would be little short of remarkable if the individual did not conclude he was not going to be permitted to obtain advice. Under such circumstances, he is as effectively denied counsel as if the agent had expressly informed him he was not entitled to legal assistance until charges were preferred. United States v Gunnels, supra; United States v Rose, supra.

The principal opinion nevertheless concludes that tenacious questioning by an agent who simply ignores the accused's request is sufficient to excuse the deprivation involved. I prefer the sounder approach that a clear indication that an accused desires to consult an attorney requires military investigators to discontinue their interview and afford the accused a reasonable opportunity to seek advice. This was the essence of our decisions in United States v Gunnels and United States v Rose, both supra, and we should adhere to that principle.

In view of the denial to the accused of his right to consult counsel and the major inconsistency between his pretrial statement and his testimony in court, I would reverse the decision of the board of review and authorize a rehearing.