UNITED STATES, Appellee

v

JAMES E. SWIFT, Staff Sergeant, U. S. Air Force, Appellant

17 USCMA 227, 38 CMR 25

No. 19,818

August 25, 1967

*Avon N. Williams, Jr., Esquire,* and *Lieutenant Colonel Robert S. Amery* argued the cause for Appellant, Accused. With them on the brief were *Colonel Joseph Buchta* and *Lieutenant Colonel Vincent J. Sherry, Jr.*

*Lieutenant Colonel William F. Rutherford* argued the cause for Appellee, United States. With him on the brief were *Colonel Emanuel Lewis,*

*Lieutenant Colonel Harry O. Hinz,* and *Lieutenant Colonel David B. Stevens.*

## Opinion of the Court

QUINN, Chief Judge:

In 1964, the accused went on trial for premeditated murder, but was convicted of unpremeditated murder, and sentenced to a dishonorable discharge, confinement at hard labor for life, and accessory penalties. A board of review set aside the conviction and ordered a rehearing on the ground the defense had been improperly restricted in its effort to question, before trial, agents of the Office of Special Investigations who had investigated the offense. See United States v Enloe, 15 USCMA 256, 35 CMR 228. At the rehearing, the accused was again convicted; and, in addition to other punishments, the court-martial imposed confinement at hard labor for ten years. The findings of guilty and the sentence were affirmed on intermediate review. Alleging one hundred fifteen assignments of error, the accused appealed to this Court for further review.

On the morning of January 25, 1964, the dead body of Inge Bauss, a German national, was found in her room at the Hotel Wuerzburgerhof, Frankfurt, Germany. A doctor and the civilian police were called. The doctor examined the corpse, and concluded that death had resulted by manual strangulation. This opinion was confirmed by a pathologist, who performed an autopsy on the same day. Investigation by German police led to the accused, who was in Germany on temporary duty and had registered at the hotel. The evidence against the accused included his fingerprint on a beer bottle in the room of the dead girl. On January 31, the accused made a statement in which he admitted he met the girl at a bar and went with her to her room; the girl "seemed . . . in an angry mood," so "I kept saying to her, not aloud, but to myself, 'keep on, keep on nagging me, you're going to get yours'"; finally, he "grabbed" her by the throat "until she quit moving."

One of the principal evidentiary questions at trial was the admissibility of the accused's pretrial statement. A number of assignments of error relate to the issue; they fall into two groups. The first group is concerned with both alleged coercion and threats and alleged promises of leniency during an interrogation by the German police on January 27. As to the alleged coercion and threats, the accused contends the conditions of his confinement by the German police and the manner of the interrogators were oppressive and frightening; he also testified they threatened to put him into a dungeon for up to two years. As to the alleged promises, he contends he was promised that if he confessed he would get a trial by a German court and "100% leniency." Purportedly, these influences carried over into subsequent interrogations by Office of Special Investigations agents, and, particularly, infected the interrogation that resulted in the pretrial statement admitted in evidence.

Testimony by Government witnesses contradicts that of the defense in every material respect; some of the accused's testimony on the matter is inconsistent with other parts of his testimony. The board of review meticulously examined the record of trial, and concluded the pretrial statement was freely made, after full advice to the accused of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. We have made an independent examination of the evidence and we are satisfied there is ample evidence to support the law officer's decision to admit the statement and submit the factual issue as to voluntariness to the court members for their consideration. United States v Traweek, 16 USCMA 50, 54, 36 CMR 206.

The second group of errors dealing with the admissibility of the January 31st statement alleges, in substance, that the accused was denied the right to counsel during various periods of interrogation by police officers. The

**229**

testimony on this point is very extensive. For the purpose of decision, we need not recount all of it, or refer to the conflicts between the testimony on behalf of the accused and that of the Government witnesses. The salient evidence is set out below.

About 4:30 a.m., on Sunday, January 26, 1964, the accused was awakened in his room in the transient billets, Wiesbaden Air Base, Wiesbaden, Germany, and escorted to the OSI office at the base. Among those present in the office were two German detectives and two OSI agents. One of the agents, Vartan Asdourian, advised the accused he was suspected of murdering a girl tentatively identified as Inge Bauss, and informed him of his rights under Article 31, Uniform Code of Military Justice. The accused said he had arrived in Wiesbaden on January 24, but he denied knowing the victim. He agreed to a search of his room for the purpose of obtaining the clothing he wore on the night of January 24. Before going to his room for the search, the accused overheard an agent tell Asdourian that the German officers wanted to take the accused into custody and take him "downtown." Whereupon, the accused told Asdourian he would like "to see a lawyer before the Germans took . . . [him] downtown." Asdourian assured him he would try to have "some people from the Legal Office" talk to him before he went downtown. After the search, the accused reminded Asdourian of his earlier request. Asdourian informed the staff judge advocate, Lieutenant Colonel George L. Wenrich, of the accused's request, and the latter assigned Captain David R. Ellison, a lawyer on his staff, to counsel the accused. He instructed Captain Ellison to answer every legal question raised by the accused, but he should not enter into the conventional attorney-client relationship with him.

Captain Ellison conferred with the accused before the German police took him away. He informed the accused he could not establish a regular confidential attorney-client relationship with him, but could advise him of his rights as a suspect; and he did so. Among other things, he said: " 'When the Germans or the OSI or anyone else questions you, you can just sit there; you don't even have to say Hello; you don't have to say anything or talk to them about anything.' " After the conference, the accused departed the base in custody of the German police.

On January 27, 1964, the accused was questioned by the German police. The principal interrogator was Gerhardt Knappik, Chief of the Frankfurt Criminal Division. At the beginning of the questioning, no mention was made as to what right, if any, the accused had to counsel. In the course of the interview, the accused was asked what he would say if he were informed his fingerprint was found in the girl's room. He answered that he did not know, and he would rather have counsel before he answered the question. Knappik stopped the questioning and went to an adjoining room to confer with "American officers" as to whether, "on an international basis," the Germans were required to furnish counsel to the accused; German law did not require appointment of counsel for police interrogations. The Americans advised Knappik they knew of no obligation under American law to provide counsel before charges were preferred. Knappik resumed the interrogation. He informed the accused that under German law he would not be furnished with counsel until formally charged. After considering his situation, the accused "agreed" to answer some questions. At the end of the interview, he made a handwritten statement in which he admitted he was with the girl. He maintained he awakened to find the girl dead, and he fled in panic.

On the afternoon of January 28, Asdourian was informed by the deputy district commander of the OSI that the accused had been turned over to the American authorities by the Germans and was confined at Lindsey Air Station, Wiesbaden, Germany. About two o'clock that day, he interrogated the accused. He testified, and the accused acknowledged in his own testi-

**230**

mony on the admissibility issue, that the accused was again fully informed of his rights under Article 31. The accused contended he told Asdourian he had nothing to say until he talked to his defense counsel, but Asdourian disputed the contention. At any rate, the accused admitted he "thought it over" and decided to give Asdourian an account of his presence in the girl's room. It was essentially the same as the one he had given the German police, with the additional recital of past experiences involving dreams and blackouts.

On January 30, the accused was again seen by Asdourian. After advice as to his rights under Article 31, he was asked if he would submit to a lie detector test. He refused until he could talk to a doctor, because he did not "feel up to it mentally." After some further conversation, however, he agreed to talk to Asdourian if the conversation was recorded for the benefit of a doctor. At no time during the interview did the accused ask for a lawyer, although he did mention the difficulties he had had with the German police in that regard. On returning to his cell, the accused told Master Sergeant Spero Mihilas, the confinement supervisor, that he had had some difficulty in obtaining a lawyer and he asked for help. Mihilas gave him the form to request counsel. The accused filled out the form. That evening, Captain Ellison came to see him in response to the request. The Captain repeated substantially the same advice he gave the accused on January 27.

On January 31, the accused was brought to the OSI office and introduced to Agent Osie C. Record, Jr., a lie detector operator. The accused refused to take a test until he could first consult a doctor. He was transported to the United States Air Force Hospital in Wiesbaden, where he was interviewed for about an hour by Colonel Dasil Smith, Chief of the Psychiatric Division. At the end of this interview, the accused was again advised of his rights under Article 31 by Asdourian. On this occasion he made the statement which was admitted into evidence at trial.

As brief as the summary of the evidence is, it is apparent that the advice given by the OSI agents to the accused, as to his right to counsel during interrogation as a suspect, is not sufficient by the standards promulgated by the Supreme Court of the United States in Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966). See also United States v Tempia, 16 USCMA 629, 37 CMR 249. However, the agents did procure a lawyer to advise the accused of his rights whenever they were requested to do so, and the lawyer gave the accused proper advice as to his right to do and say nothing. What the agents and the lawyer did, and what they said, fully complied with the law then in effect. United States v Wimberley, 16 USCMA 3, 36 CMR 159. The Supreme Court denied retroactive effect to Miranda; and in applying Miranda principles to military trials, we have also adopted its effective date. United States v Hardy, 17 USCMA 100, 37 CMR 364. We hold, therefore, that, so far as the interrogations conducted by the American authorities were concerned, there was no violation of constitutional command or any provision of the Uniform Code of Military Justice.

What then of the interrogation by the German police? Indisputably, this interrogation did not satisfy the preliminary warning requirement of Article 31. An independent investigation by a foreign police officer is, however, not subject to the Uniform Code. United States v Grisham, 4 USCMA 694, 16 CMR 268. At trial, defense counsel contended that this principle did not apply because the investigation by the German police was a joint operation with the OSI, with the result that it produced the January 31st statement to Agent Asdourian. Since the accused was not advised of his right to remain silent at the beginning of the German interrogation, defense counsel contended the statement the accused gave to the German police was tainted, and this taint infected the statement to As-

dourian. Knappik testified that the investigation by his office was to provide the factual background for a decision by the German district attorney whether to continue German control over the accused or to relinquish it to the American authorities under the Status of Forces Agreement. Special Agent Thomas Howard Whitman, who was called as a defense witness, testified he attended the first part of the interrogation by Knappik solely as "an observer." He was in civilian clothes and was not introduced to the accused as a police officer. He maintained he left the interrogation room before any significant remark was made by the accused. There is also other evidence to indicate that, factually, the two police organizations proceeded independently and for their own purposes. On the record, we cannot conclude, as a matter of law, that the two investigations merged into an indivisible entity. In our opinion, the law officer correctly treated the matter as a question of fact; and he properly gave the court-martial appropriate instructions to decide the issue as a question of fact. United States v Murphy, 14 USCMA 535, 34 CMR 315; see also United States v King, 14 USCMA 227, 34 CMR 7. We are satisfied that the relationship between the two police investigations and the effect of one upon the other was properly presented to the court-martial.

Approaching the counsel issue from another standpoint, the accused contends he was subject to "[a]rbitrary" application of the "so-called Kuhfeld rule." The Kuhfeld rule was apparently a memorandum promulgated by the then Judge Advocate General of the Air Force, who considered the opinion of this Court in United States v Gunnels, 8 USCMA 130, 23 CMR 354, and established a procedure by which the accused, faced with interrogation by law enforcement officers, could, on request, be advised of his rights under Article 31 by the staff judge advocate or his representative. The memorandum set out the then military rule that military counsel need not be appointed to represent an accused at a police interrogation. The accused complains that he was prevented from showing the existence of a policy of disregarding the Kuhfeld rule as to white accused and enforcement of it as to Negro accused.

We have scrutinized the record and find no hint of any discriminatory practice in the command of granting counsel to white accused during the police investigative stage of the proceedings, while denying counsel to Negro accused. Neither do we discern any restriction upon the defense effort to show the existence of discrimination. In fact, defense counsel was allowed to show two instances of assignment of counsel to white accused before charges were formally signed— one occurred before knowledge of the Kuhfeld memorandum, the other, involving a white officer, occurred after the staff judge advocate learned of the rule. The record merely indicates proper rulings by the law officer on specific objections by trial counsel. For example, defense counsel wanted to inquire into the outcome of the officer's case, but the law officer sustained trial counsel's objection. The disposition of the charge was patently immaterial to the question of alleged discrimination in the appointment of counsel in the police investigative stage of the proceedings.

Before the accused entered his plea, defense counsel moved to dismiss the case, contending the accused had been denied due process of law. The immediate complaint was the denial of separate petitions addressed to the Secretary of the Air Force and to the Commanding General of the Seventeenth Air Force for three-fold relief: A change of venue; examination of the fingerprint evidence by the Federal Bureau of Investigation; and a "complete psychiatric examination to be conducted by a group of Board-certified, experienced psychiatrists at a military psychiatric center in the continental United States." On this appeal, the accused contends the law officer erred to his prejudice by denying that part of the motion pertaining to the psychiatric examination, without submitting his ruling to objection by any member of the court-martial.

The petition to the Secretary of the Air Force was dated May 7, 1965. It was referred to the Commanding General, Seventeenth Air Force, as involving "matters . . . in the nature of judicial acts" vested by law in the convening authority. This petition was denied on June 2, 1965. The denial noted that the prayer for psychiatric relief was "now moot" because the accused had been examined in the Department of Psychiatry, Wilford Hall, United States Air Force Hospital, Lackland Air Force Base, Texas. A copy of that psychiatric report had been given to defense counsel. The petition to the Commanding General, Seventeenth Air Force, was dated June 1, 1965. In denying this petition, the Commanding General referred to the petition to the Secretary of the Air Force, and indicated his decision was "without prejudice" to renewal of the application at trial.

We need not examine the wide-ranging arguments by defense counsel, which include an attack on the conditions of the accused's incarceration during the period of psychiatric evaluation at Lackland. Looking past its label as a motion to dismiss the charges, and disregarding the irrelevancies, the motion evolves as one for a continuance to obtain a psychiatric evaluation of the accused in the United States by a specially composed board of psychiatrists. From some remarks by defense counsel, we are willing to assume the law officer was put on notice that this was the substance of the motion. See United States v Nichols, 8 USCMA 119, 124, 23 CMR 343.

The evidence and argument presented to the law officer indicated that, previous to the first trial, the accused had been examined by a board of medical officers constituted as provided in Chapter XXIV, Manual for Courts-Martial, United States, 1951, and found to be unaffected by mental disease, defect, or derangement. Letters from civilian psychiatrists consulted by defense counsel indicated they did not diagnose the accused as suffering from any specific mental condition affecting his capacity to act responsibly in re-

gard to the offense charged; two merely suggested that material submitted to them be reviewed by a psychiatrist experienced in forensic psychiatry; the third, from Dr. Joseph Satten, Director of the Division of Law and Psychiatry of The Menninger Foundation, observed that the previous psychiatric examinations should be "considered . . . preliminary," and a "more extensive examination" of the accused was "indicated." Dr. Satten further noted that The Menninger Foundation could not undertake the evaluation. His next comment, which apparently became the basis for the defense petition to the Secretary of the Air Force and to the Commanding General, Seventeenth Air Force, is as follows:

"On the basis of previous experience with such cases, I would like to point out that it is unlikely that The Menninger Foundation or other civilian psychiatric centers would come up with medical findings strikingly different from those discovered by a group of experienced psychiatrists at a military psychiatric center."

All the letters from the civilian psychiatrists were written before the psychiatric evaluation at ██ Lackland. That evaluation was made by Colonel Martin V. Giffen, Chairman of the Department of Psychiatry. His qualifications included certification by the American Board of Psychiatry; he was a Fellow in the American Psychiatric Association; he had lectured in forensic psychiatry; and he was the author of nineteen published papers in the field of psychiatry. In lay terms, his evaluation established the accused as sane. It further appeared that, before the first trial, the accused had been examined by a German civilian psychiatrist, and his report was unfavorable to the accused. Finally, there was evidence that the accused's return to Germany for the retrial had been several times deferred to enable the defense to obtain an evaluation by civilian psychiatrists.

On the evidence before him, the law

officer was fully justified in denying the defense motion. United States v Schick, 7 USCMA 419, 424, 22 CMR 209; see also United States v Frye, 8 USCMA 137, 23 CMR 361.

Appellate defense counsel insist that the real relief sought by the motion was further inquiry into ▋ the accused's sanity, which is a matter for final decision by the court-martial, not the law officer. Manual for Courts-Martial, supra, paragraph 122b. This view misapprehends the core of defense counsel's contentions at trial. He did not ask for an ordinary psychiatric evaluation in Germany. He wanted a medical board composed of officers differently qualified from the kind of medical board specified in the Manual, and he wanted the evaluation to be made within the United States rather than in the jurisdiction where the court-martial was convened, or in the nearest available facility.[1] Thus, the relief sought was materially different from the standard "recommendation [by the court-martial] that the accused be examined *as provided in 121*." (Emphasis supplied.) *Id.*, page 203. The conditions sought to be imposed by defense counsel upon the inquiry could be effectuated by the law officer in his grant of a continuance. See United States v Nix, 15 USCMA 578, 36 CMR 76; United States v Knudson, 4 USCMA 587, 16 CMR 161. In our opinion, therefore, defense counsel intended to present only a question for the law officer's consideration. We are confirmed in this opinion by a number of other circumstances.

The motion was presented in an out-of-court hearing. In the course of the hearing, many matters were raised which, we are certain, defense counsel would not have wanted the court members to know about. For example, we are certain he would not have wanted the court members to know Dr. Satten's opinion that it was "unlikely" that civilian psychiatrists, including those at The Menninger Foundation, would "come up with medical findings strikingly different" from those of experienced military psychiatrists; or that Dr. Giffen who examined the accused at Lackland was reputed to be one of the three "top" psychiatrists in the Air Force; or that a German civilian psychiatrist had examined the accused shortly after the offense, and his findings were unfavorable to the defense's present contention. As we read the record, the defense intended the motion to be considered solely by the law officer. Consequently, we perceive no error in the law officer's failure to submit his ruling to objection by any court member, as in the case of an ordinary motion for further inquiry into the accused's sanity. See United States v Dicario, 8 USCMA 353, 24 CMR 163; United States v Goard, 13 USCMA 588, 33 CMR 120.

Turning to the selection of the law officer and the court members, the accused contends the Seventeenth Air Force deliberately discriminated against Negroes. He notes that in the period between 1963–1965, no Negro served as law officer of a general court-martial in the command, although there were Negro officers in the Air Force qualified for appointment. We are not, however, informed as to how many, if any, qualified Negro officers were in the command and available for appointment at any time relevant to this case. Be that is it may, we have carefully examined the statistics relied upon by the accused and we have carefully scrutinized the evidence, and we find no hint of unconstitutional discrimination in the selection of the law officer and court members. United States v Crawford, 15 USCMA 31, 35 CMR 3 (1964), motion for leave to file petition for writ of certiorari denied, 380 US 970, 14 L ed 2d 281, 85 S Ct 1349 (1965).

We have considered the other alleged errors, both individually and from the standpoint of their possible cumulative effect. Some of the contentions may perhaps be stretched into

---

[1] There is evidence in the record indicating that the Air Force psychiatric facilities in Germany were substantial and of excellent quality.

a conclusion of error. For example, some of the photographs of the victim offered into evidence by trial counsel might have been excluded. See United States v Wimberley, supra, page 13. None of the errors either singly, or in combination, however, present a fair risk of prejudice to the accused in any substantial right.

On the record, the accused received a fair and impartial trial, and was properly convicted and sentenced. Accordingly, the decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (dissenting):

I dissent.

I cannot agree the requirements of the law in effect prior to our decision in United States v Tempia, 16 USCMA 629, 37 CMR 249, and that of the Supreme Court in Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966), were met in this case when, in compliance with the accused's request for an attorney, he was furnished with an officer who was forbidden to establish an attorney-client relationship with him and to whom he could put only legal questions. To say our decisions in United States v Gunnels, 8 USCMA 130, 23 CMR 354, and United States v Wimberley, 16 USCMA 3, 36 CMR 159, were so limited is a distortion of what we there said and renders the beneficent rule we there laid down a mere meaningless form. I cannot agree that these forerunners of the *Miranda* decision, supra, may be so lightly treated and, accordingly, I register my dissent.

The facts before us are not in dispute. Upon being apprehended as a suspect in the death of Inge Bauss, the accused expressly indicated his desire to consult an attorney before he was released into German custody. The Staff Judge Advocate purported to furnish him counsel, but the attorney was instructed he could not enter into an attorney-client relationship with the accused, nor could he do more than answer legal questions posed to him. The attorney so limited his relation-ship with the accused and, in fact, did little more than advise him of his rights as a suspect. There was no confidential exchange of information, weighing of the facts, and advice to the accused as to what he should do.

After his return to military custody, the majority concede accused continued to request the services of a lawyer. Again, he was furnished only with the limited services of the attorney who had earlier seen him and whose "advice" was once more just a substantial reiteration of accused's rights under Uniform Code of Military Justice, Article 31, 10 USC § 831. Thereafter, accused made the incriminatory statement which was received in evidence against him. My brothers say that a lawyer giving an accused "proper advice as to his right to do and say nothing . . . fully complied with the law then in effect." That is just not so.

Let us begin at the beginning. In United States v Gunnels, supra, the accused was being interrogated by criminal investigators. Concededly, he was fully advised of his rights under Code, supra, Article 31. He stated he would remain silent until he could consult with counsel. Freed for that purpose, he went to the Staff Judge Advocate section. Alerted to his visit in advance, the Staff Judge Advocate had forbade any officer-attorney to give legal advice to, or consult with, the accused. Expressly denied such assistance, Gunnels underwent further interrogation by the investigators. Again, it was uncontroverted that he "asked, and was permitted, to read Article 31 for himself." Subsequently, he was refused permission to have counsel present at his interrogation, *which resulted in no statements being made by him.*

We reversed, without any mention of the legal advice and counsel to which accused was entitled being limited to a reiteration by an impartial arbiter of his rights under Code, supra, Article 31. In fact, we hardly could have done so, in face of the baldly stated declaration in the opinion that the accused knew his rights and had

**235**

been given a copy of Code, supra, Article 31, to read for himself. The basis for our reversal was the refusal to allow accused to consult with counsel and to have his assistance. We pointed out that an accused did not have the right to *appointed* counsel during an investigation by a law enforcement agent, but we went on to say, at page 133:

"... The distinction between a criminal proceeding and an investigation does not, however, mean that a person suspected of the commission of a crime can be precluded from consulting counsel. The belief entertained by the Staff Judge Advocate and the investigating officers in this case that such a prohibition exists is wholly wrong. One may not have a right to appointed counsel because no charge has been lodged against him, but he is not thereby precluded from obtaining necessary legal advice . . . We, therefore, strongly condemn the practice, which appears to be common in the military, of telling a suspect that he cannot consult with counsel in connection with an interrogation by enforcement agents. A suspect has no right to the appointment of military counsel, *but he most assuredly has a right to consult with a lawyer of his own choice or with the Staff Judge Advocate. Cf. Rule 5(b), Federal Rules of Criminal Procedure. We also condemn, therefore, the Staff Judge Advocate's order to his assistants to refrain from advising the accused if he sought their counsel.*" [Emphasis supplied.]

Thus, we squarely held in *Gunnels,* supra, that an accused was entitled to consult with "a lawyer of his own choice or with the Staff Judge Advocate" as a client seeking legal advice from the only available fountain. We expressly condemned an order prohibiting the Staff Judge Advocate's assistants "from advising the accused if he sought their counsel." Again, not a word was said about limiting such legal assistance to a reiteration of the accused's right to remain silent.

So also is such a doctrine not found

in our subsequent decisions. Thus, in United States v Rose, 8 USCMA 441, 24 CMR 251, we condemned the refusal of investigators to allow accused to contact his attorney during a period of interrogation. Indeed, we reiterated, at page 442, that an accused is not to be "precluded from obtaining necessary legal advice" and that "One suspected of an offense in the military has a right to consult with a lawyer of his own choice or with the staff judge advocate." Cf. United States v Melville, 8 USCMA 597, 25 CMR 101; United States v Wheaton, 9 USCMA 257, 26 CMR 37.

In United States v Cadman, 10 USCMA 222, 27 CMR 296, we held no more than that the evidence did not raise an issue of the denial of the right to consult with counsel. And in United States v Adkins, 11 USCMA 9, 28 CMR 233, we simply determined the accused abandoned his request for counsel and "volunteered his statement because 'the jig was up,' or for other reasons of his own." *Id.,* at page 13. We nevertheless reiterated the view an accused "most assuredly has a right to consult with a lawyer of his own choice or to obtain advice from military counsel furnished by the staff judge advocate." *Adkins,* supra, at page 12. Again, in United States v Slamski, 11 USCMA 74, 28 CMR 298, the Court pointed out, at page 77, the right of an accused to "retain civilian counsel at his own expense or obtain, if possible, the voluntary services of a military lawyer."

So, also, in United States v Kantner, 11 USCMA 201, 29 CMR 17, at page 204, we held there was no evidence to support accused's contention "he was deprived of or misinformed of his right to consult with counsel." Finally, none of the other cases in which we have considered the right of an accused to consult with military or civilian counsel suggest that such is satisfied by a "consultation" in which no attorney-client relationship can be formed. See United States v Justice, 13 USCMA 31, 32 CMR 31; United States v Odenweller, 13 USCMA 71, 32 CMR 71; United States v Petty, 13 USCMA 398, 32 CMR 398; United

States v Powell, 13 USCMA 364, 32 CMR 364; United States v Rogers, 14 USCMA 570, 34 CMR 350; United States v Houston, 15 USCMA 239, 35 CMR 211; and United States v Traweek, 16 USCMA 50, 36 CMR 206. In short, the law was, prior to *Miranda*, supra, succinctly stated by Judge Kilday, in United States v Brown, 13 USCMA 14, 32 CMR 14, at page 17:

> "The law is clear under the cases previously cited that when an accused or suspect requests such information it is error to misadvise him of his right to consult with an attorney and 'force him to submit to questioning . . . without a lawyer.' *Gunnels*, supra, at page 135."

Thus, we finally come to an analysis of United States v Wimberley, supra, which is cited for the proposition that this accused was afforded his right to counsel. It, like the cases already cited, stands for no such proposition. There, it was perceptively urged upon the Court that Escobedo v Illinois, 378 US 478, 12 L ed 2d 977, 84 S Ct 1758 (1964), required an accused to be advised of his right to consult with counsel, in addition to a warning of his rights under Code, supra, Article 31. We held such not to be required, but no issue was there presented as to an actual request by the accused and action thereon. Hence, *Wimberley*, supra, is irrelevant to the issue now before us. In sum, then, this Court—prior to the additional requirements laid down in *Tempia*, supra, as a result of the *Miranda* decision—has steadfastly adhered to the rule that an accused, if he requests such, must be afforded the right to consult with counsel, either civilian counsel of his own choosing or military counsel who is willing to undertake the duty. Certainly, we have never departed one whit from the condemnation in United States v Gunnels, supra, of any effort by a Staff Judge Advocate to prohibit an officer-attorney in his office from acting as a lawyer for the accused.

Yet, that is precisely what has occurred here. All concede the accused requested counsel and continued to seek the opportunity for consultation. He was flatly denied that right, for all that he was allowed to do was to consult an officer who could not form an attorney-client relationship with him; could only answer specific *legal* questions which Swift might pose; and could do little better than again advise him of his rights under Code, supra, Article 31. In short, there could be no privileged communications between the parties; no answer given to the critical question, "What should I do?" and no legal evaluation of accused's general situation rendered. Indeed, how can a lay accused even know what "legal" questions to frame, and how can he secure any legal advice if he is unable confidentially to communicate the facts of his case? In all conscience, when such strictures were imposed by the Staff Judge Advocate upon the officer whom he furnished as counsel to the accused, he as effectively denied him the right to an attorney as if he had forbidden the officer's services altogether. United States v Gunnels, supra; cf. United States v Brown, supra. Indeed, in United States v Slamski, supra, the Court held similar action by a judge advocate not to constitute him an attorney for the defendant.

In short, then, I necessarily must conclude that the Staff Judge Advocate, as in United States v Gunnels, supra, may not, having acceded to accused's request for a lawyer, so restrict the latter's function that the accused is effectively denied counsel. In my opinion, that is what occurs when an attorney-client relationship is made impossible and any source of competent advice to the accused is dried up.

In reaching this conclusion, I am aware the Court made comments in United States v Tempia, supra, which are susceptible of the interpretation placed on *Gunnels*, supra, by the Chief Judge. But these *dicta* referred to the lack of any duty on the Staff Judge Advocate to appoint counsel for the accused. We did not there deal with the separate entitlement of the accused to consult with a military lawyer

**237**

who was willing to hear him out, nor do our comments there apply to such a situation. Indeed, they can have no bearing on strictures placed on the conduct of an attorney who is actually designated as the lawyer available for consultation when the accused makes his request.

In sum, then, I am of the view that the accused having requested an attorney and one having been made available, it was prejudicially erroneous for the Staff Judge Advocate to limit that attorney's advice to a reiteration of his rights under Code, supra, Article 31, and to deny the accused any real legal service at all. Accordingly, I would conclude his statement was inadmissible in evidence and that its receipt was prejudicially erroneous.

I would reverse the decision of the board of review and order a rehearing.