UNITED STATES, Appellee,

v.

Joanne PARRILLO, First Lieutenant
U.S. Air Force, Appellant.

No. 66,211.
ACM 28143.

U.S. Court of Military Appeals.

Argued Oct. 3, 1991.

Decided March 6, 1992.

For Appellant: *Captain Michael D. Burt* (argued); *Colonel Jeffrey R. Owens* (on brief).

For Appellee: *Lieutenant Colonel Brenda J. Hollis* (argued); *Major Paul H. Blackwell, Jr.* and *Major Morris D. Davis* (on brief).

*Opinion of the Court*

EVERETT, Senior Judge:

Contrary to appellant's pleas, a general court-martial (military judge alone) convicted her of signing a false official statement, wrongfully distributing cocaine, wrongfully using marijuana, conduct unbecoming an officer by wrongfully engaging in sexual intercourse with an enlisted person (2 specifications), and wrongfully solicitating another to use cocaine or ecstasy—violations of Articles 107, 112a, 133, and 134, Uniform Code of Military Justice, 10 USC §§ 907, 912a, 933, and 934, respectively. The judge

sentenced Parrillo to dismissal from the service and to confinement and forfeiture of $2,000.00 pay per month for 18 months. The convening authority approved these results, and the Court of Military Review affirmed. 31 MJ 886 (1990).

We granted review of three issues.[1] Two relate to admissibility of evidence concerning a telephone conversation between appellant and one of her lovers in which the latter arranged to obtain cocaine from appellant. The third questions whether the evidence was sufficient to support findings that appellant's sexual relationships constituted conduct unbecoming an officer. We resolve these issues adversely to appellant.

I

A

Lieutenant Parrillo was the Deputy Chief of Air Traffic Control Operations (DCATCO) at RAF Lakenheath, United Kingdom. She and her superior, the Chief of Air Traffic Control Operations (CATCO), were the only two officers assigned to Air Traffic Control Operations (ATCO); however, the organization included 45 to 55 enlisted persons.

Appellant's duties included assuming the CATCO's supervisory responsibilities over all enlisted members in his absence, which she in fact did on two occasions—once for a period of 2 months and the other for about 2½ months. Her normal duties as DCATCO extended to maintaining and managing personnel records. In this connection, although she did not write or indorse Airman Performance Reports on the enlisted members of ATCO, she did have drafting and editing responsibilities concerning them.

---

1.     *Issue I*
   WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY DENYING TRIAL DEFENSE COUNSEL'S MOTION TO SUPPRESS EVIDENCE.
   *Specified Issue*
   IF APPELLANT'S FOURTH AMENDMENT RIGHTS WERE VIOLATED BY IMPROPER EAVESDROPPING, SHOULD ALL EVIDENCE DERIVED FROM THE CONVERSATION HAVE BEEN SUPPRESSED?
   *Issue II*
   WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY REFUSING TO GRANT TRIAL DEFENSE COUNSEL'S MOTION FOR A FINDING OF NOT GUILTY REGARDING THE SPECIFICATIONS UNDER CHARGE III AND CHARGE III.

During different periods of time between November 1986 and May 1989, appellant formed personal relationships, which included having sexual intercourse, with three enlisted members of ATCO. In each instance, her lover called her by her first name in private; and appellant discussed with two of her lovers the need to be discreet so that their relationship would not be discovered. Indeed, she once asked one of them "if, in fact, anything had come up, would I *testify* that I had had a relationship with her—sexual relationship or a personal relationship otherwise." (Emphasis added.)

The longest of the three relationships was with Sergeant Charles Anderson, who met appellant when she processed into the unit in November 1986. Their personal socializing began shortly thereafter and continued off and on for about a year and a half, during which time they engaged in sexual intercourse more than 50 times. Anderson and appellant once smoked marijuana together; and once or twice she offered Anderson cocaine and told him that she had access to the drug if he wanted to try it.

On April 24, 1989, a sergeant from the squadron that included ATCO visited the local Office of Special Investigations (OSI). He related to OSI agents that appellant had engaged in personal relationships with enlisted members of ATCO and that appellant had used cocaine and possibly still was in possession of it.

OSI's investigation led them to interview Anderson 2 days later as a potential witness to the alleged misconduct. During the interview, Anderson admitted his personal involvement with Parrillo and later admitted that he had once smoked marijuana with her. Also, he revealed to the agents that, over lunch a month earlier, appellant had "offered—told him she was in possession of cocaine. She had cocaine, did not show it to him, said that she either had it or could get it, and that she asked him if he wanted to get any or if he wanted to use any with her."

The agents asked Anderson whether he would help them ascertain if appellant still

had cocaine and if he would participate in a controlled purchase of cocaine using a beeper to signal surveilling agents when the transaction was complete. Anderson hesitated to participate, indicating that he felt he would be betraying a personal friend. Ultimately—after agents had advised him "that his cooperating with our office could only look positively, or in his favor, when it came to punishment being administered"—he did agree to telephone appellant and ask her whether she had any cocaine she could get to him.

The initial attempt to reach appellant was on April 27, 1989. The following colloquy between trial counsel and Agent Noonan describes the arrangements:

Q. Now, on the 27th of April 1989, did Sergeant Anderson try to call Lieutenant Parrillo in your presence?

A. Yes, he did.

Q. Okay. And about what time of day was that?

A. It was in the afternoon.

Q. Okay. And where did this take place at?

A. It was in our office—Special Agent Garcia's and myself.

Q. Okay. Now, prior to that telephone conversation, did you discuss how you might overhear the conversation yourself?

A. Yes.

Q. Okay. And what were you going to do?

A. Sergeant Anderson was going to hold the phone at an angle away from his head so that we could listen and hear at the same time.

Q. Okay. And did he in fact place the call that day?

A. Yes, he did.

Q. Okay. And was this from a phone in the OSI office?

A. Yes, it was.

Q. Did you have to specially place any equipment into your office to make this call?

A. None, no.

Q. Was the phone already there on this occasion?

A. Yes, it was.

\* \* \* \* \* \*

Q. Okay. Was that [initial] call successful?

A. No, it was not.

Q. Okay. Now, Sergeant Noonan, I take it that on that occasion you had intended to monitor the telephone conversation had it been successful, is that correct?

A. Yes.

Q. Okay. And what authority were you acting pursuant to on that day?

A. OSI Reg 124–60.

Q. Let me show you in particular—well, I have it marked as Appellate Exhibit III. If you would, take a look at page 2–4, paragraph 2–4. Is that the authority that you were acting pursuant to that day?

A. Yes.

Q. Okay. Now, Sergeant Noonan, you must have the consent of one of the parties, is that correct?

A. Yes.

Q. Okay. Now, how did Sergeant Anderson consent or manifest his consent to you?

A. We asked him if he gave his consent, and he agreed verbally.

\* \* \* \* \* \*

Q. Okay. Now, on the next day, the 28th of April, that was a Friday, right?

A. Yes, it was.

Q. Did you see Sergeant Anderson that day?

A. Yes, I did.

Q. And what time did you see him?

A. Two times. The first time was around lunchtime.

Q. Okay. And what was—

A. The second time—

Q. —the purpose of that one?

A. To try and make a phone call, again.

Q. Was that successful?

A. No, it was not.

\* \* \* \* \* \*

Q. Okay. What time was the second call placed [on the 28th]?

A. Just after five o'clock—just after close of business.

\* \* \* \* \* \*

Q. Okay. And where did this telephone call take place?

A. Same office. Jose Garcia's and mine.

Q. And on this occasion, this would be the second call on the 28th, did you ask that Sergeant Anderson consent to your monitoring that call?

A. Yes.

Q. And what was his answer?

A. He said yes, again. He consented.

\* \* \* \* \* \*

Q. Okay. Now, you've mentioned Mr. Garcia before. Was he present on the 28th?

A. Yes, he was.

Q. Okay. And what was he doing that day? What was his particular role?

A. He was taking notes from the conversation.

Q. Okay. And where was he seated in relation to you all?

A. He was at his desk, which placed him about two feet from myself.

Q. Okay. Now, was the 28 April 1989 telephone call, the second one, successful?

A. Yes, it was.

\* \* \* \* \* \*

Q. Were you listening to all this [the conversation with appellant]?

A. Yes, I was.

Q. How was it possible that you could hear everything that was being said?

A. Lieutenant Parrillo's voice carries easily. I was really close to the phone myself. There was no mistaking what was being said.

\* \* \* \* \* \*

Q. Okay. Now, did you ever treat this case as an interception case?

A. No.

Q. Okay. Is it fair to say that this, in your opinion, was a simple monitoring of a telephone conversation?

A. Yes, listening to.

Q. And that's the way you treated it for the duration of the call and every unsuccessful call that you made?

A. Yes.

\*      \*      \*      \*      \*      \*

Q. Was this case ever treated by any OSI agent or any investigative officer that you know of, as an interception case?

A. No.

During the telephone conversation discussed above, appellant agreed to leave a small amount of cocaine in Anderson's mail box at the base postal center on either Sunday or Monday. Agents placed the postal center under surveillance, and on Sunday they saw appellant leave that building. Immediately they checked Anderson's mail box and found cocaine inside.

## B

At arraignment, appellant timely moved to suppress any evidence resulting from this telephone conversation. In part pertinent to this appeal, she contended that the OSI agents had unlawfully intercepted her telephone conversation with Anderson. *See* Mil.R.Evid. 317, Manual for Courts–Martial, United States, 1984. Each party filed extensive written briefs in support of its position on this motion and offered substantial testimonial and documentary evidence. In the end, the military judge denied the defense motion to suppress and indicated that, after trial and after he had had an opportunity to examine the record of the proceedings, he would attach to the record his essential findings and rationale for his ruling. *See* RCM 905(d), Manual, *supra.*

The following segment of the military judge's "Essential Findings Memo of Decision and Ruling on Su[p]pression Motion" reflects his reasoning:

Federal Statute. The applicable federal statute, Title 18 U.S.C., Sections 2510 et seq, "Wire and Electronic Communications Interception and Interception of Oral Communications," protects both wire communication and oral communication from certain forms of interception, delineates procedures for lawful interception of communications, and makes unlawfully intercepted communications inadmissible in evidence. The statute regulates the manufacture, possession, distribution, and advertising of wire, oral, and electronic communication intercepting devices, and provides for confi[sc]ation and civil damages in the event of their misuse.

Applicability. This statutory scheme is applicable to the military, and has been implemented by DOD and Service regulations, and by virtue of such implementation, has extraterritorial application.

Definitions. The statute and the regulations define the term "intercept" to mean the "aural or other acquisition of the contents of any wire, electronic or oral communication, *through the use of any electronic, mechanical, or other device.*" The term "aural" means perceived by the ear. The statute and implementing regulatory schemes then proceed to define "electronic, mechanical, or other device." In so doing, each excepts from the definition any "telephone ... furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or the user in its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business ... or by an investigative or law enforcement officer in the ordinary course of his duties."

The court interprets this exclusion to mean that ordinary, regularly-installed telephones used for day-to-day calls, whether furnished by the phone company or the subscriber, are *not* "electronic, mechanical, or other devices," within the meaning of the regulatory scheme. The court finds that the telephone used to

receive aural communication in this case was a regularly installed telephone, leased by the Air Force from British Telecom and used by the Air Force as a subscriber (R. 181–85). The court further finds that the ordinary course of business by the OSI includes using its regularly installed telephones to call witnesses and suspects concerning matters under investigation (R. 182). Such regular use of installed telephones solely in conjunction with the ears of one or more third parties (with the consent of one of the knowing parties to the conversation) does not constitute an "interception." Sgt. Anderson did consent to the listening in on the handset by the OSI. He did so orally, and confirmed his consent in writing (R. 111). Moreover, he demonstrated his consent by holding the phone out for the agents to listen, and by not informing the accused that third parties were listening in (R. 27, 39, 68). The court finds the procedural non-compliance as to the *form* of Sgt Anderson's consent did not infringe upon any substantive right intended by statute or regulation to be conferred upon the accused or persons similarly situated.

*Fourth Amendment.* To the extent there is a reasonable expectation of privacy in wire communication between two regularly installed telephone instruments, the accused's privacy right was infringed voluntarily by Sgt Anderson, and not by an impermissible intrusion by agents of the Government. The accused was betrayed to law enforcement authorities not by prohibited meddling with wire communications, but by her own misplaced trust in Sgt Anderson, who permitted AFOSI agents to listen to the handset as he was talking by telephone with the accused.

## II

In this Court, appellant continues her attack on the lawfulness of the OSI's over-hearing her conversation with Anderson. In support, she cites Mil.R.Evid. 317; various portions of Chapter 119 of Title 18 (Wire and Electronic Communications Interception and Interception of Oral Communications), USC §§ 2510–21; 32 C.F.R. Part 42 (Interception of Wire and Oral Communications for Law Enforcement Purposes); and Air Force Regulation (AFR) 124–18, Technical Surveillance Activities for Law Enforcement Purposes (27 Sep 1984). However, we disagree with her application of these authorities.

According to Mil.R.Evid. 311(a),

[e]vidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity is inadmissible against the accused if ... [t]he accused makes a timely motion to suppress ... and ... [if] [t]he accused had a reasonable expectation of privacy in the person, place, or property searched; the accused had a legitimate interest in the property or evidence seized when challenging a seizure; or the accused would otherwise have grounds to object to the search or seizure under the Constitution of the United States as applied to members of the armed forces.

■ Appellant properly moved to suppress evidence concerning the contents of her telephone conversation with Anderson and any evidence derived therefrom. Therefore, her motion should have been granted if there was an unlawful search or seizure and if she had "standing"[2] to make the motion.

■ Under *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), and successor decisions of the Supreme Court, such as *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), and *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), standing hinges on "a reasonable expectation of privacy"; and Mil.R.Evid. 311(a)

**2.** The term "standing" is rejected in Mil.R.Evid. 311(a), Manual for Courts–Martial, United States, 1984, because "a majority of the committee" that drafted the Rule considered it "obsolete." *See* Drafters' Analysis of Mil.R.Evid. 311, Manual, *supra* at A22–16 (Change 2). Nonetheless, the term is convenient for the present discussion.

seems intended to incorporate this test. We doubt that such an "expectation" exists with respect to a telephone conversation overheard with the consent of a party thereto by the eavesdropper's holding an ear near the telephone being used by that party. In short, a party to a telephone conversation has no legitimate expectation of privacy as to the contents of that conversation after it has reached the other end of the telephone line. *Cf. Rathbun v. United States,* 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); *United States v. Sturdivant,* 13 MJ 323 (CMA 1982); *United States v. McLeod,* 493 F.2d 1186 (7th Cir. 1974); *People v. Siripongs,* 45 Cal.3d 548, 247 Cal.Rptr. 729, 754 P.2d 1306 (1988); *State v. McDermott,* 167 N.J.Super. 271, 400 A.2d 830 (1979). The same rationale might also preclude standing if the telephone conversation were overheard by use of an extension phone with the consent of a party thereto. *Cf. Rathbun v. United States, supra; United States v. Harpel,* 493 F.2d 346 (10th Cir.1974).

■ Even if Parrillo had standing, she lacked the grounds for an objection. Under Mil.R.Evid. 317(a),

> [w]ire or oral communications constitute evidence obtained as a result of an unlawful search or seizure within the meaning of Mil.R.Evid. 311 when such evidence must be excluded under the Fourth Amendment to the Constitution of the United States as applied to members of the armed forces or if such evidence must be excluded under a statute applicable to members of the armed forces.

Since the parties to this telephone conversation were in England, it might be questioned whether the Fourth Amendment applies. *Cf. United States v. Verdugo-Urquidez,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990).[3] However, even if the Fourth Amendment applies, it has not been violated. Just as "a reasonable expectation of privacy" is the test for standing, so, too,

it is the criterion for determining whether a search has occurred. *Cf. California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Thus, the same precedents which establish that Parrillo had no standing to move successfully for suppression of the telephone conversation equally demonstrate that merely overhearing a telephone conversation does not constitute a "search" for Fourth Amendments purposes.

■ We also conclude that the statutes on which appellant relies—18 USC §§ 2510–2520—were not intended by Congress to have extraterritorial effect, *Stowe v. Devoy,* 588 F.2d 336, 341 (2d Cir.1978), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2862, 61 L.Ed.2d 299 (1979); so they have no direct applicability to this search in England. Although we observe that Mil.R.Evid. 317(c) restricts the interception of wire and oral communications for law enforcement purposes, we also perceive that violation of the "regulations" referred to in Mil.R.Evid. 317(c) is not mentioned in Mil.R.Evid. 317(a).[4] Thus, such a violation probably would not warrant exclusion of the evidence of the conversation. *Cf. United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

■ Even if we believed that the provisions of Title 18 which have been cited by Parrillo might have extraterritorial effect, we still are convinced that no statutory violation would have occurred. According to the statutory definition, " 'intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 USC § 2510(4). Of course, the only "device" employed to acquire the contents of

---

3. Of course, *Verdugo–Urquidez* might be distinguishable because there the victim of the search was a nonresident alien.

4. An interesting article on these regulations is Clark, *Electronic Surveillance and Related Investigative Techniques,* 128 Mil.L.Rev. 155 (1990).

Parrillo's conversation with Anderson was the telephone instrument used by Anderson himself; and, in our view, acquisition of the contents of a telephone conversation in this manner is not "interception." [5]

We note, too, that, according to the statutory definition in 18 USC § 2510(2), an "oral communication" is "any oral communication uttered by a person *exhibiting an expectation that such communication is not subject to interception* under circumstances justifying such expectation...." (Emphasis added.) To state the obvious, when appellant uttered her "oral communication" into her telephone, while knowing that Anderson was on a similar instrument on the other end of the telephonic connection, she certainly did not exhibit "an expectation that such communication is not subject to" receipt by Anderson's telephone. Thus, appellant's citation of cases such as *Campiti v. Walonis*, 611 F.2d 387 (1st Cir.1979) *(but see United States v. Sturdivant*, 13 MJ 323 (CMA 1982)), involving use of an *extension* telephone, is inapposite.

■ Even if the statutory prohibition of interception and disclosure of wire, oral, or electronic communications in 18 USC § 2511 applied extraterritorially, and even if an "interception" were involved, the OSI agents' overhearing the telephone conversation would be lawful nonetheless. 18 USC § 2511(2)(c) provides specifically:

It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

The investigator was "acting under color of law" and had the prior consent of Sergeant Anderson, who was a party to the conversation. Indeed, even if the OSI had not been "acting under color of law," the prior

consent by Sergeant Anderson would bring any "interception" within this exception under 18 USC § 2511(2)(d):

It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

Certainly the agents had no "criminal or tortious" purpose.

To the extent that regulations are relevant to this case, we believe that their drafters intended to adopt the terms and concepts used in the federal legislation on the same subject. Thus, "interception" of an oral communication requires "use of" a "device." *See* 32 C.F.R. § 42.6(f); para. 1f, AFR 124–18. Just as no "device" was used by investigators within the meaning of the statute, so, too, no "device" was used for purposes of the regulation. Like the statute, 18 USC § 2510(2), the regulations also require a reasonable expectation of privacy. *Cf.* 32 C.F.R. § 42.6(g); para. 1g, AFR 124–18. Just as there was no expectation of privacy for purposes of the statute, Lieutenant Parrillo did not exhibit a reasonable expectation within the meaning of the regulation that her conversation was not subject to being overheard when it reached Anderson's telephone instrument. Thus, the defense citation of cases such as *Campiti v. Walonis, supra,* involving use of an extension telephone, is also inapposite here. *But see United States v. Sturdivant, supra.*

Our interpretation of the various regulations is fortified by our inability to understand why the drafters of either Mil.

5. Appellant's claim in this Court that *Anderson himself* was a "device" within the meaning of these provisions is clever—but fruitless. Apart from the questionable merit of such an assertion—which, if accepted, would render unlawful any scenario in which an informant merely *told* law enforcement agents something he had been told—Agent Noonan did not receive appellant's communication *through Anderson.*

R.Evid. 317 or service regulations would intend to preclude military criminal investigators from obtaining evidence by a means which does not constitute "interception" under the federal legislation governing electronic surveillance and which was not otherwise prohibited by that legislation. In short, we can find nothing in the Constitution, federal statutes, or service regulations which sustains appellant's claim.

### III

■ The specifications that are challenged by appellant as insufficiently supported by the evidence allege that she "wrongfully, dishonorably and disgracefully ha[d] sexual intercourse with" two enlisted men "over whom [she] exercised supervisory authority." Inasmuch as a supervisory relationship clearly was pleaded in each specification in this prosecution, *see United States v. Wales*, 31 MJ 301 (CMA 1990), the only question presented here is whether such a relationship was proved by the evidence. *See United States v. Appel*, 31 MJ 314 (CMA 1990).

The evidence reflects that appellant, as one of only two officers in the unit, was second in command over all of some 50 enlisted persons in that unit—including the three men with whom she allegedly had social and sexual relationships. Moreover, in one instance, she was in the midst of such a relationship while, in the CATCO's absence, she was in actual command over her lover.

In light of these factors and the total circumstances described earlier in this opinion, we are sure that the evidence of record provides a sufficient basis for rational factfinders to conclude beyond reasonable doubt that appellant's charged acts violated a custom of the service under circumstances that constituted conduct unbecoming an officer. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

### IV

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judge COX concur.

Judges CRAWFORD, GIERKE, and WISS did not participate.