**152**

UNITED STATES, Appellee

v.

Kevin R. BROWN, Airman First Class
U.S. Air Force, Appellant.

Nos. 93–0259.
CMR No. S28469.

U.S. Court of Military Appeals.

Argued Jan. 4, 1994.

Decided Aug. 19, 1994.

For Appellant: *Lieutenant Colonel G. Michael Lennon*, USAFR (argued); *Colonel Terry J. Woodhouse* and *Captain David D. Jividen* (on brief); *Colonel Jay L. Cohen*.

For Appellee: *Lieutenant Colonel Thomas E. Schlegel* (argued); *Colonel Richard L. Purdon, Colonel Jeffery T. Infelise, Major Paul H. Blackwell, Jr.* (on brief).

*Opinion of the Court*

WISS, Judge.

At his special court-martial, appellant pleaded guilty to two specifications of wrongfully uttering a total of sixteen checks and not guilty to two specifications of uttering a total of thirty more checks and thereafter dishonorably failing to maintain sufficient funds for their payment. *See* Arts. 123a and 134, Uniform Code of Military Justice, 10 USC §§ 923a and 934, respectively. His guilty pleas were accepted as provident, and a court-martial composed of officers convicted him of the remaining offenses, too. Thereafter, the court-martial sentenced appellant to a bad-conduct discharge, confinement for 3 months, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review affirmed them.

We granted review of appellant's petition to consider his claim that the military judge erred to appellant's prejudice by denying his trial motion *in limine* to suppress the testimony of his commander, Colonel Moran, concerning statements made to him by appellant during a counseling session. On *de novo*

review of the military judge's ruling, *see United States v. Davis,* 36 MJ 337, 340 (CMA 1993), *aff'd on other grounds,* ——U.S.——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), we hold, instead, that the military judge did not err when he expressly found that appellant's commander neither suspected nor reasonably should have suspected appellant of criminal misconduct at the time of the session in question. *See United States v. Kendig,* 36 MJ 291, 294 (CMA 1993) (" 'The test to determine if a person is a suspect is whether, considering all facts and circumstances at the time of the interview, the government interrogator believed or reasonably should have believed that the one interrogated committed an offense.' *[United States v. Morris,]* 13 MJ [297] at 298 [ (CMA 1982) ] (footnote omitted) ... "). *Accord United States v. Davis,* 36 MJ at 340; *United States v. Schake,* 30 MJ 314, 317 (CMA 1990). Therefore, the commander was not required to advise appellant of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, as a predicate for the session, so appellant's statements in question are admissible, notwithstanding that he was not so advised. *See United States v. Kendig,* 36 MJ at 294; *United States v. Morris,* 13 MJ at 298.

The facts underlying appellant's claim are straightforward and not in dispute. Appellant was stationed overseas and ordered new checks from his stateside credit union. When the checks did not arrive, appellant placed a stop-payment order on them. The credit union, however, erroneously stopped payment on additional checks written to the Army & Air Force Exchange Service (AAFES) on various dates between February and May 1990. This error by the credit union—which it candidly acknowledged in a letter dated May 17, 1990—resulted in appellant having a debt to the AAFES for the returned checks of about $3,300.

Colonel Moran learned of appellant's dishonored checks through notices of them that he began receiving in the spring of 1990; as well, he learned of the credit union's eventual acknowledgement of its fault for dishonoring them. Appellant assured his commander that, while he was on leave in the United States in June, he would put his business in order and return with a credit union check sufficient to pay off the AAFES.

Notwithstanding that assurance, however, appellant returned *sans* the check. As the Court of Military Review recounted the events:

In mid-July, exasperated, Colonel Moran called him in and, in his words:

We talked about just the general responsibility he had for fulfilling his financial obligations, the fact that I was not pleased that he had not brought the check back. Initially, he was supposed to have mailed the check back, but that the check had not come back and that we were now having to deal with it again to get the check here. I asked him again "when we take care of this, when we get this all paid off we are not going to have any more bad checks show up, you've got enough money in the bank to cover the check you are asking for to take care of things."

Colonel Moran stated that he asked the appellant whether there were any other checks out there, and that the appellant told him there were none that were going to be dishonored. The appellant called the Credit Union the same day and obtained a check which satisfied a substantial part, though not all, of his indebtedness to AAFES....

Unpub. op. at 2. Regrettably, however, appellant continued to write worthless checks over the next several months. The specifications of which he was convicted address those checks.

Appellant moved at trial to suppress the testimony of Colonel Moran concerning statements made by appellant during this mid-July counseling session. Moran forthrightly admitted that he had not preceded this session with reading Article 31 rights to appellant; he explained, however, that at that time, he

firmly believe[d] the situation he found himself in was a result of the bank having made a, not really a mistake, but the problems with the bank in that he was initially making an effort to take care of that. The

only thoughts that I had at the time was that he was not really doing that in a timely manner and we were trying to spur him on and get it done so that we could move on and get away from that.

Consistently, Moran explained the purpose of his session with appellant as being

to again clarify what he was doing to solve his financial problem that he found himself in. At that point, in the command section, we were miffed at him for not taking what we thought to be more responsible action in getting the thing solved, but we still viewed it as a bank error that needed to be straightened out.

After full litigation of the motion by the parties, the military judge denied it. He explained his ruling as follows:

[W]ith respect to the actual meeting and what the accused said at that meeting, it was an official meeting, but there was no suspicion of misconduct on the accused's part, with respect to the source of the indebtedness which was the purpose of the meeting. It was perhaps to expedite his response but again, even with respect to his response, the impression I get from the testimony, it was not viewed as criminally derelict on the accused's part, but really he wasn't acting quickly enough from the standpoint of the squadron in resolving the matter.

The squadron wanted him to move more quickly and assist him in moving more quickly to resolve it. . . . Insofar as the Article 31 issue is concerned, yes, this was official, but there was no suspicion or reasonable basis for suspicion. The motion is denied.

■ In this Court, appellant continues his argument that "appellant was a suspect when being interview[ed] by Colonel Moran, not to mention that Colonel Moran 'should have suspected' the appellant committed an offense," quoting from *United States v. Davis, supra.* He urges, "Colonel Moran's actions speak louder than his words with regard to his suspicions regarding the appellant." Final Brief at 4–5. We disagree.

First, in fact, appellant had not even written the checks here in question at the time of the counseling session. The only bad checks that had been written as of that date were the checks that had been dishonored as a result of error by the credit union. So, there simply were no bad checks, in the criminal sense, then in existence which one could suspect appellant of writing.

Second, we agree with the observation of the Court of Military Review that Moran's knowledge of the credit union's admission of error undermines any reasonable inference that Moran suspected or should have suspected appellant of dishonorably failing to pay the checks about which he began receiving notices in the spring of 1990. Moreover, we agree with the military judge that the evidence of record indicates that, even as to Moran's frustration with appellant's procrastination in taking care of those earlier checks, Moran never considered this criminally derelict, nor reasonably should he have. *Cf. United States v. Gardner,* 35 MJ 300 (CMA 1992).

Plainly and simply, Moran viewed this matter as one in which his leadership was required to prod his subordinate to clear up a matter precipitated by the credit union's error. All agree that the counseling session was "official" as distinct from informal or personally motivated. The "official" nature of such a session, however, is the beginning, not the end, of the inquiry.

■ In the absence of any fair indication at the time of that counseling session either that the known checks indicated criminal misconduct or that appellant would continue to write bad checks (this time, with criminal *mens rea*), the military judge did not err. The unknown and unknowable future criminal proclivities of appellant cannot transform leadership counseling into criminal interrogation. Any presumption to the contrary arising from Moran's command relationship over appellant is fully rebutted. *See United States v. Good,* 32 MJ 105, 108 (CMA 1991).

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and GIERKE concur.