**UNITED STATES**

v.

**Staff Sergeant Herman RIOS, Jr., FR582–11–1467 United States Air Force.**

**ACM 31877.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 20 July 1995.

Decided 15 Jan. 1997.

Appellate Counsel for Appellant: William J. Holmes (argued), Colonel Jay L. Cohen, Major Kevin P. Koehler, Captain Todi S. Carnes, and Captain Richard D. Desmond.

Appellate Counsel for the United States: Captain Mitchel Neurock (argued), Colonel Theodore J. Fink, and Lieutenant Colonel Michael J. Breslin.

Before HEIMBURG, GAMBOA, and SENANDER Appellate Military Judges.

## OPINION OF THE COURT

GAMBOA, Judge:

The appellant was convicted, contrary to his pleas, by a military judge sitting as general court-martial, of rape, forcible sodomy, assault and battery, and indecent acts and liberties with a child. Articles 120, 125, 128, and 134, UCMJ, 10 U.S.C. §§ 920, 925, 928, 934 (1988). All of the offenses were committed against the appellant's daughter, MR, a child under the age of 16 years. The appellant's approved sentence includes a dishonorable discharge, 18 years confinement, and reduction to the grade of E–1. The appellant argues that the evidence regarding all adjudged offenses is legally and factually insufficient to establish his guilt beyond a reasonable doubt. He also asserts that the military judge committed prejudicial error by admitting statements he made to his daughter during a "pretext" telephone call and by admitting a statement he made to a civilian social worker. We find no evidence to support a portion of the assault and battery offense, but otherwise we find no error and affirm.

## I. LEGAL AND FACTUAL SUFFICIENCY

The appellant argues that the evidence of record is not sufficient to establish his guilt of the charged offenses beyond a reasonable doubt, either factually or legally. He essentially attacks the credibility of MR; he points out that at first she denied being sexually abused when questioned by various authorities, asserts that she fabricated the story to avoid being placed in a private school, and questions her reputation for truthfulness.

The test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Furthermore, we must "draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Blocker,* 32 M.J. 281, 284 (C.M.A.1991). The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of this Court are themselves convinced of appellant's guilt beyond a reasonable doubt. *United States v. Turner,* 25 M.J. 324, 324–25 (C.M.A.1987).

### A. Assault and Battery

The appellant was convicted of unlawfully striking MR on her waist and legs with a belt, and grabbing her on her arms and around her neck with his hands. We find no evidence that he grabbed MR's neck, but otherwise affirm. CS, a school mate of MR, testified that he dated MR for about two weeks. On 9 January 1995, after school, MR, who had been "grounded" by her father, asked CS if she could go to his house, and told him that she had permission from her father to do so. While they were at CS's home, CS's grandmother telephoned to tell him that the appellant was looking for his daughter and would be going to CS's home. MR began crying and asked if she could hide, whereupon CS let her hide in his bedroom closet.

According to CS, the appellant arrived, walked into the home, began calling for MR, and eventually went to the bedroom where he found CS. Although CS tried to convince the appellant that MR was not there, MR slipped in the closet, and the noise alerted the appellant to her presence. The appellant pulled MR out of the closet and began hitting her. When CS tried to restrain the appellant, the appellant knocked him to the ground and dragged MR out of the room by her hair while she was lying on the ground. CS stated that the appellant also hit MR with his fist and slapped her.

MR's testimony was consistent with that of CS. She stated that she was "grounded" for telephoning CS while she was at "Chuck E Cheese" and she violated her "grounding" by going to CS's house after school. When she learned her father was coming to CS's house, she panicked, began crying, and hid in the closet. MR stated that the appellant found her in the closet, grabbed her arm, and dragged her out. MR testified that the appellant slapped her and hit her in the face with his fist, and also hit her with his fist on her leg when they were in the appellant's automobile. When they arrived home, the appellant ordered her to go to her room, take her dress off, and return downstairs. He then spanked her with a belt and kept asking "if me and [CS] had sex...." Photographs introduced at trial, as well as the testimony of Dr. (Major) Davis Anisman, a family practice physician at David Grant Medical Center, Travis Air Force Base (AFB), California, corroborate MR and CS's testimony.

The evidence clearly establishes the appellant's guilt beyond a reasonable doubt with respect to assault and battery, except the words, "... and around the neck....". We affirm the remainder of Charge III, specification 1.

### B. Sexual Offenses

The appellant was convicted of committing the various sexual offenses, noted above, against MR between 15 February 1990 and 11 January 1995. MR testified that her father first sexually abused her at his workplace, the Mission Control Office, when she was 12 years old. He put his hand down her pants, but not under her underwear, and

"french kissed" her. "A couple of months later" he came to her bedroom at night, when her stepmother was gone, placed a pillow over her face, took off her underwear, and forced his penis in her, causing her to scream. MR stated that, after that event, the appellant had sexual intercourse with her about twice a week, and later the frequency increased until they were having sex every night, except when she was "on her period" or when the appellant was absent because of temporary duty (TDY). The incidents usually occurred at night when no one else was at home; sometimes they occurred in the day.

On one occasion, MR testified, her father asked her to take off her clothes, and they watched a pornographic video (indecent liberties with a child specification). The appellant wanted to imitate the acts being performed in the video and asked her to touch his penis. He also touched and forced his finger up her vagina. MR stated that this occurred many times. She also testified that they emulated acts that she saw on a pornographic video, including oral sex. He also placed his penis in her anus on two occasions. MR testified that, on another occasion, he did not put his penis in her, but kept touching her and kissing her "all over her chest."

MR testified that she last had sexual intercourse with her father on 10 January 1995, in his bedroom. She stated that when they finished, she wiped her vagina. The appellant wiped his penis with the same tissue and threw it in the trash can. She never told anyone except CS that her father was molesting her. She initially told the authorities that the appellant did not molest her because he told her not to tell anyone, but "when I really thought about it and I realized what I had been going through with this stuff that he had been doing to me and I couldn't take it any more. My feelings were hurt so much I had to let it out. Then I told them the truth of what was going on." MR testified that the appellant was the only person with whom she had ever had sexual intercourse. She was given a rape protocol and tested positive for chlamydia. Although the appellant later tested negative for chlamydia, his medical records indicated that he had received doxycycline (a treatment for chlamydia) pursuant to his TDY assignments.

Robert Bobsin, clinical director for the Community Treatment Center in Fairfield, California, a child sexual abuse treatment center, testified regarding child sex abuse accommodation syndrome. He stated that child victims often experience five behaviors and characteristics—secrecy, helplessness, entrapment, accommodation, and retraction. There is a progression beginning with secrecy and ending with retraction. He stated that it is not unusual for the child to, at first, deny or fail to report incidents of abuse because they learn to accommodate, especially if they are victims of multiple abuse.

Air Force Office of Special Investigations (AFOSI), Special Agent (SA) Tomi Kingi testified that, on 12 January 1995, he was contacted by personnel at the David Grant Medical Center, and asked to interview MR. MR eventually related she had been sexually abused by her father since 1992 and as recently as 11 January 1995. As a result, MR was placed in foster care. Her younger sister, ME, denied being abused and was left in the appellant's home. After interviewing MR, SA Kingi received authorization and conducted a search of the appellant's on-base residence. Various pornographic videos, as well as the contents of the appellant's bathroom trash can, were seized, corroborating information MR had provided. Five tissues from the trash can were sent to the United States Army Crime Laboratory (USACIL).

Clement Smetana, chief of the USACIL serology section, testified as an expert in the area of deoxyribonucleic acid (DNA) analysis. He stated that three of the five tissues he received from the AFOSI showed the presence of semen and were tested for DNA. The AFOSI also submitted blood samples taken from the appellant and MR. Two of the three tissues contained a substance with a DNA pattern "consistent with" that of the appellant. One of those tissues had DNA patterns that "were consistent" with those of the appellant and MR. Mr. Smetana stated that the findings were consistent with MR's testimony that the appellant wiped semen from his penis and that she used the same tissue to wipe her vagina.

Dr. Anisman testified that he performed a rape protocol on MR, which included drawing blood, and gave it to AFOSI. He stated that the condition of MR's hymen was "not inconsistent with being sexually active" or with having sexual intercourse almost daily. However, his "physical exam did not reveal any evidence of sexual trauma that you could see...." He asserted that MR's medical records contained several entries of a vaginosis diagnosis of a "specific bacterial infection which is fairly uncommon before puberty and the onset of the menstrual period." A "culture" test performed on MR was positive for chlamydia, which "is believed to be spread only by sexual contact."

MR's testimony was both credible and corroborated. The above evidence convinces this Court, beyond a reasonable doubt, that the appellant committed the offenses of which he stands convicted. We reject this assignment of error.

## II. PRETEXT TELEPHONE CONVERSATION

### A. Facts

The appellant next argues that the military judge committed prejudicial error by admitting statements he made, without Article 31, UCMJ, 10 U.S.C. § 831, rights advisement, during a telephone conversation—initiated at the direction of, and monitored by, AFOSI and state law enforcement authorities. The appellant asserts that MR was acting as an agent of AFOSI, and that he had been ordered by his commander to talk to MR. Although the appellant made no overt admissions during the conversation, he did not deny MR's assertions of abuse, and the trial counsel noted that fact during his findings argument. The appellant's motion to suppress his telephone statements to MR was denied by the military judge.

On 13 January 1995, SA Kingi, after having interviewed MR the previous day, contacted the Fairfield Police Department and agreed to run a joint investigation with them. The Fairfield police asked that the AFOSI conduct a "pretext" telephone call to the appellant upon his return to Travis AFB from a TDY assignment. SA Kingi testified

that, pursuant to AIR FORCE INSTRUCTION 71–101, he first made an oral request and received authorization from his commander to conduct a "pretext phone call." SA Kingi provided his headquarters with a synopsis of MR's allegations and informed them that MR had consented to participating in the pretext phone call. He advised his headquarters that he wanted to "elicit some type of a response" from the appellant regarding the allegations, and that "it was important that we [do] it as soon as he got back from a TDY before he heard about what was going on." SA Kingi believed that because they had conducted a search of the appellant's home, the appellant's sister, who lived with the appellant might have alerted the appellant to the investigation. SA Kingi stated that they wanted "to make the phone call before [the appellant] knew the specifics of the investigation and the allegation." He also wanted to avoid intimidation by the accused of the victim because, even though MR was no longer living with the appellant, he could still telephone her.

After receiving authorization for the pretext phone call, SA Kingi asked the appellant's commander, Lieutenant Colonel S to assist them by having the appellant go home as soon as he returned from his TDY, "and then we would make the phone call." SA Kingi stated that "we needed Sergeant Rios to go to his residence because we felt like he probably wouldn't talk about these things if we used the [duty] phone...."

The appellant testified, on the motion, that he returned to Travis AFB from a TDY around 1700 hours and was told to report immediately to his commander. Upon arriving, Colonel S told him, "You need to call [MR]." Colonel S also stopped him from talking and said, "just go ahead and go home and call [MR]." Colonel S then handed him a piece of paper with his phone number and another paper which said, "Call [MR] 429-0902." Colonel S confirmed that he told the appellant to go home because MR would be calling him there. As soon as the appellant arrived at his home, he received a telephone call from MR. The appellant testified and contends that he felt Colonel S ordered him to contact and talk to his daughter, and that

he "felt he had to stay on the line and answer her questions because of the order...."

SA Mingi stated that he gave MR "some general guidelines as to what to talk to her father about, specifically the allegations" and that he also "wrote down a couple of things for her to ask or ... say." She was told not to tell her father that she was calling him from the AFOSI office. She was to say she was at a foster home and no one was home. MR was to try to elicit a response from the appellant regarding the allegations of sexual abuse and to focus on what he had done to her and why. The phone call was placed from the AFOSI office and was being monitored by AFOSI personnel, including SA Kingi. The appellant was not advised of his rights under Article 31, UCMJ.

MR, testifying on the defense's motion to suppress appellant's telephone statements, said the AFOSI told her they wanted her to "make the phone call to see if my dad was going to admit what he had done to me...." She signed a "piece of paper" which said "that I agreed to make this phone call and to let them record it." She also said that she was not tricked, forced, rewarded, or threatened in any way. She stated that she read the entire consent form before signing. They explained the document to her but they did not explain what a number of the words meant; *e.g.*, "coercion, unlawful inducement." She admitted that she did not understand what they meant. But she stated that she understood what the paper meant and did not feel that she had to sign the paper or make the phone call. It took her about 10 minutes to decide if she wanted to consent. It was not an easy decision, but she consented because, "I just thought it was right to—I was curious as to what he was going to say anyway, so I wanted to call." The AFOSI listened on the headphones and they wrote "a few little messages down" asking her to ask certain questions.

The appellant's trial defense counsel moved to suppress this evidence because: the appellant was not advised of his Article 31, UCMJ rights; the intercept was improper as there was no emergency and the government should have proceeded under the normal consensual wiretap provision which requires written authorization from the Air Force General Counsel instead of the AFOSI commander; and MR, as a minor, lacked the capacity to consent to the intercept. Before us, the appellant again raises those objections.

## B. Discussion

■■■ Article 31(b), UCMJ, 10 U.S.C. § 831(b) (1994) provides that,

> No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

The standard of review that we apply to a military judge's determination that a rights advisement was not required is *de novo*. *United States v. Brown*, 40 M.J. 152, 152–53 (C.M.A.1994). We may adopt the military judge's essential findings of fact, but are not bound to do so. Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1988); *United States v. Cole*, 31 M.J. 270, 272 (C.M.A.1990). Nonetheless, we are generally inclined to give them great deference. *See Cole*, 31 M.J. at 272.

> [Article 31] applies only to situations in which, because of military rank, duty, or other similar relationship, there might be subtle pressure on a suspect to respond to an inquiry. Accordingly it is necessary to determine whether (1) a questioner subject to the Code was acting in an official capacity ... or only had a personal motivation; and (2) whether the person questioned perceived that the inquiry involved more than a casual conversation ... Unless both prerequisites are met, Article 31(b) does not apply.

*United States v. Duga*, 10 M.J. 206, 210 (C.M.A.1981). The suspect must perceive the questioning is an official inquiry, otherwise there is not a coercive atmosphere. *United States v. Harvey*, 37 M.J. 140, 143 (C.M.A.1993), *cert. denied*, 510 U.S. 1091, 114 S.Ct. 919, 127 L.Ed.2d 213 (1994). Investiga-

**564**

tors monitoring a telephone conversation involving a suspect, with the consent of one of the parties, where the party acts as an agent for the AFOSI, is a "routine and permissible undercover technique." *United States v. Parrillo,* 31 M.J. 886, 893 (A.F.C.M.R.1990), *aff'd,* 34 M.J. 112 (C.M.A.1992).

"It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c) (1994). The issue of whether minors can consent to actions which impact Fourth Amendment rights was answered in the affirmative by the 11th Circuit Court of Appeals in *Lenz v. Winburn,* 51 F.3d 1540, 1548–49 (11th Cir.1995), and we adopt their analysis and conclusion..

■ · The military judge denied the appellant's motion to suppress, concluding that the use of a pretext phone call "is a recognized, legitimate law enforcement technique," and that the AFOSI had a valid law enforcement reason to seek emergency authorization for the call since "to be successful ... it must occur as soon as possible after the return of" the appellant to Travis AFB. He further concluded that the procedure to listen to and record the conversation between MR and the appellant was lawful and did not require Article 31, UCMJ, warnings or right-to-counsel warnings, since there was no evidence "that the accused perceived this conversation with his daughter involved the coercive pressure of a custodial interrogation within which Article 31 warnings applied." He also concluded that

> [MR] was capable of providing valid consent to the OSI for her participation in the pretext call ... she was adequately advised as to the purpose and effect of the call and that she understood the voluntary nature of the request by the OSI. She made an informed, knowing, and voluntary decision to participate. Minors are able to provide legal consent even when it involves a waiver of their own rights or the rights of their parents. I cite in support of this conclusion *U.S. v. Clutter,* 914 F.2d 775 at

778 wherein 12 and 14 year old male children were able to lawfully consent to a search of their family home, and *Fare v. Michael C.* the U.S. Supreme Court case at 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 where the court held that juveniles were capable of waiving their *Miranda* rights.

We agree with the military judge's determinations. We find MR's consent knowing, intelligent, voluntary, and valid. Authorization for the "pretext" telephone call was properly obtained. We are troubled and do not condone the AFOSI's use of the appellant's commander to have the appellant phone his daughter. However, we are convinced that the appellant's statements were voluntarily made. On cross-examination, the appellant, when asked if he was concerned that Colonel S would punish him if he did not answer MR's questions, replied, "Colonel [S] was not on my mind when I was speaking with [MR]." The appellant further conceded that he felt he had complied with Colonel S's "order" by receiving MR's phone call and that MR did not mention Colonel S's name or reference the AFOSI during the call. We are also cognizant that the appellant had intimidated MR into remaining silent for two years. We reject this assignment of error.

### III. STATEMENT TO SOCIAL WORKER

The appellant also argues that the military judge committed prejudicial error by admitting an excerpted, unsigned, and undated statement (Prosecution Exhibit 1) from a report written by Ms. Aisha Jarvis, the civilian social worker responsible for handling MR's juvenile dependency case. He asserts that the statement was taken in violation of his rights to remain silent and to be represented by counsel under Article 31, UCMJ, and the Fifth Amendment. Prosecution Exhibit 1 states,

> Additionally, on January 16, 1995 when this worker called to discuss arrangements for a supervised visitation with [MR], if she was amenable to this arrangement, Mr. Rios commented he was very interested in having a visit with [MR]. Of particular interest was the fact that he asked this

worker, "if a person has sex with a child that seemed to like it, it's different isn't it." This worker explained to Mr. Rios it was not different or acceptable at all and advised him to discuss with his attorney his concerns regarding the criminal aspects of this case.

Rosemary Kennedy, a Social Services Supervisor, testified that Ms. Jarvis is a Senior Social Services Worker with the Solano County Child Protective Services. She stated that Prosecution Exhibit 1 is an excerpt from a standard "intake response form for a juvenile dependency action" which is used in every case "[w]hen a petition [that alleges child abuse or neglect] is filed in the juvenile court." Ms. Kennedy stated that the Court looks at where the child will be placed and looks at the allegations of the abuse and neglect of the child to decide the disposition. The form is presented to the juvenile court and it "gives more information about the petition allegations in terms of the investigation that was done on that particular case." According to Ms. Kennedy, the form is "backup data for the petition itself." Internal office rules and regulations require people in Ms. Jarvis' position to make those reports. Ms. Kennedy also testified that the documents are maintained in a dependency case file, and the file is kept with the social worker and with the court. In addition, employees are trained on how to prepare the reports. Ms. Kennedy stated that the reports are prepared for litigation and the Civil Rules of Procedure apply to these closed hearings.

Prosecution Exhibit 1 was admitted by the military judge over the defense's hearsay objections. The military judge found that the documents had been properly authenticated under Military Rule of Evidence (MIL. R. EVID.) 901 and were admissible as hearsay exceptions under MIL. R. EVID. 803(6) as business records. The trial defense counsel then moved to suppress the statement the appellant made to Ms. Jarvis since it was made without rights advisement. The appellant raises the same arguments before this Court.

The appellant testified, on the motion, that about a minute after he spoke with MR on 13 January 1995, Ms. Jarvis telephoned him seeking to arrange a visitation with MR. She introduced herself as a social worker and asked the appellant why he had abused MR. In response, the appellant asked to speak to a lawyer. Ms. Jarvis tried about three times to get him to talk about "the sexual subject," and the appellant would remind her that he wanted to speak to an attorney. While he was speaking to her, agents from the AFOSI, including SA Kingi, came to his door, and he advised Ms. Jarvis of their arrival, but she kept speaking to him. The appellant told SA Kingi that he was speaking to his social worker, but SA Kingi told him "to get off the phone now." The appellant was taken to the AFOSI office, where he asked for an attorney. The appellant asserts, unconvincingly, that this scenario demonstrates that the AFOSI and Ms. Jarvis were acting in concert.

On 16 January 1995, Ms. Jarvis again telephoned the appellant concerning the allegations and future custody of MR. During that conversation the appellant asserts he again told Ms. Jarvis he did not want to discuss the allegations without the assistance of counsel. When she persisted, he continued to talk to her. The appellant testified that he felt obligated to do so because Ms. Jarvis "stood between" him and his children. The appellant stated that he "felt like she had the key to my family" and would affect whether he would continue to have custody of his daughters. The appellant stated he told Ms. Jarvis that he "would do whatever she wanted me to do to get my family reunited again." The appellant testified that he made the statement found in Prosecution Exhibit 1 to Ms. Jarvis because he was irritated with her. He asserted that Ms. Jarvis had told him "that it wasn't nice for a grown up to have sex with a child," so he *sarcastically* (emphasis added) said, "Well what if the child has sex with the grown up? Does that make it okay?"

The appellant argues that Ms. Jarvis questioned him in her official capacity as a Child Protective Services social worker when she telephoned him on 13 January 1995, and that he apprised her at the beginning of their conversation of his desire to speak to an attorney before he answered any of her ques-

tions. He asserts that Ms. Jarvis called him again on 16 January, seeking incriminating evidence without advising him of his rights. He states that although he wasn't in handcuffs, Ms. Jarvis held his relationship with his daughter hostage, that Ms. Jarvis was working with the AFOSI, and that her investigation merged with that of the AFOSI. The appellant also argues that Prosecution Exhibit 1 was inadmissible hearsay.

■ Article 31, UCMJ, extends to civilian investigators when the civilian investigator acts "in furtherance of any military investigation, or in any sense as an instrument of the military" or when the scope and character of the cooperative efforts between civilian and military investigators "demonstrate that the two investigations merged into an indivisible entity." *United States v. Moreno*, 36 M.J. 107 (C.M.A.1992); *United States v. Quillen*, 27 M.J. 312 (C.M.A.1988); *United States v. Penn*, 18 U.S.C.M.A. 194, 199, 39 C.M.R. 194, 199, 1969 WL 5949 (1969); *United States v. Grisham*, 4 U.S.C.M.A. 694, 697, 16 C.M.R. 268, 1954 WL 2452 (1954). To determine if the two investigations have merged into one entity we consider the purpose of each of the two investigations and whether they act independently. *United States v. Swift*, 17 U.S.C.M.A. 227, 38 C.M.R. 25, 1967 WL 4362 (1967).

SA Kingi, testifying on this motion, stated that he met Ms. Jarvis at the emergency room on 12 January 1995, when he went to interview MR. He stated that he and Ms. Jarvis did conduct a joint interview of the victim on that date, but he did not summon Ms. Jarvis there, and that she was there for her own purposes. He testified that after 12 January, Ms. Jarvis stopped by his office "a couple of times," and they spoke on the phone on a few occasions, but there was "not a whole lot of coordination" between the two of them. SA Kingi stated that he was not aware of the appellant's 16 January 1995 statement to Ms. Jarvis until several months after the initial allegation, and that he, at no time, directed Ms. Jarvis to contact the accused or request that she ask him any questions. He was not present when Ms. Jarvis phoned the appellant on 13 or 16 January and does not know where the phone calls

originated, but they were not made from the AFOSI office. He stated that Ms. Jarvis stopped by the office on 13 January to get a copy of MR's statement, and she phoned to get information from him in order to place MR in a foster home. He testified that the AFOSI shared information with the various agencies downtown concerning the dependency hearing.

■ The military judge denied the motion to suppress, finding that the phone calls by Ms. Jarvis to the appellant on 13 and 16 January 1995, were not requested by the AFOSI or any other military authority. The military judge concluded that Ms. Jarvis was not acting on behalf of the military authorities at Travis AFB, and that she was pursuing her independent duties on behalf of her county agency and was not an agent of the U.S. Air Force nor subject to the UCMJ. The military judge found that there was no basis to conclude that Ms. Jarvis' child custody investigation merged into the AFOSI investigation such as to make her an agent of military law enforcement, and there was therefore no legal requirement for Ms. Jarvis to provide warnings to the appellant. The military judge also found that the conversations of 13 and 16 January were telephonic and noncustodial, that the appellant was free to terminate the conversations at any time, and that the appellant made a conscious decision not to do so for reasons independent of any AFOSI investigation. Accordingly, the military judge concluded that any admissions by the appellant were made freely, knowingly and intelligently.

We agree with the military judge's findings and conclusions. The evidence indicates two parallel investigations, with two different objectives. The AFOSI was not aware of Ms. Jarvis' 13 and 16 January 1995 phone calls. There is no evidence that she acted in concert with the AFOSI or provided any assistance or information to them. The statement made by the appellant was spontaneous, unsolicited, and not in response to any question. There was no interrogation. Furthermore, the excerpt clearly falls within the business exception to the hearsay rule. It was taken from a standard form used when a child abuse or neglect petition is filed. In-

ternal office rules and regulations required Ms. Jarvis to produce the report. The purpose of the report is to determine whether and where to place a child into protective custody. We reject this assignment of error.

## IV. CONCLUSION

 Having set aside the finding of guilty with respect to that portion of specification 1 of Charge III (assault and battery) which alleges that the appellant grabbed MR around the neck, we must try to determine what the sentence would have been absent the error. *United States v. Sales,* 22 M.J. 305, 307 (C.M.A.1986). If we can determine what sentence would have been adjudged, we may do so; otherwise, we must return the case for a rehearing. *United States v. Jones,* 39 M.J. 315, 317 (C.M.A.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 635, 130 L.Ed.2d 540 (1994); *United States v. Peoples,* 29 M.J. 426 (C.M.A.1990). We find that the sentence adjudged would have been exactly the same because this component of the assault offense was insignificant compared to the offenses of which the appellant stands convicted.

We hereby set aside that portion of Charge III, specification 1, which states, "and around the neck." The remaining findings of guilty, and the sentence, as reassessed, are correct in law and fact, the sentence as reassessed is not inappropriate, and no error prejudicial to the substantial rights of the appellant was committed. Accordingly, the findings of guilty as modified, and sentence, as reassessed are

AFFIRMED.

Senior Judge HEIMBURG and Judge SENANDER concur.